IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>JESSICA RICHMAN, et al.,<br><br>　　　　　Defendants. | Case No. 21-cv-01911-CRB<br><br>**ORDER DENYING MOTION TO DISMISS** |

The SEC alleges that Defendants Jessica Richman and Zachary Apte, co-founder's of uBiome, misled investors about fundamental aspects of uBiome's business model during the company's Series C funding round. Complaint ("Compl.") (dkt. 1). Defendants move to dismiss the complaint, primarily arguing that the SEC fails to support its allegations with the required specifics. Motion to Dismiss ("MTD") (dkt. 38). After carefully reviewing the parties' briefs, the Court concludes that oral argument is not necessary. For the reasons set forth below, the Court denies Defendants' motion to dismiss.

## I.　BACKGROUND

uBiome was a biotechnology company that focused on the human microbiome. Compl. ¶¶ 14–15. The company developed tests that individual consumers could use to receive diagnostics on the microorganisms present in their gut and genitals. Id. ¶ 15. The test results could purportedly assist with the diagnosis and treatment of a range of medical conditions, including inflammatory bowel disease and sexually transmitted infections. Id.

Richman and Apte co-founded uBiome in October 2012. Id. ¶¶ 12–14. During the life of the company, Richman served as CEO and President, and Apte served as Chief Scientific Officer and, at times, co-CEO.[1] Id. Richman and Apte were hands-on managers who "closely monitored and managed every aspect of uBiome's operations together." Id. ¶ 16. No "decision about a significant aspect of uBiome's business was made without the knowledge and approval of at least one of Richman or Apte." Id.

The charges against Richman and Apte stem from events that began in 2015. Id. ¶¶ 17–18. Prior to 2015, uBiome developed and marketed tests for consumers, which consumers paid for out of pocket. Id. ¶ 14. In 2015, uBiome shifted focus to developing tests that could be billed to insurers because "uBiome would be able to charge insurers significantly more money for the tests than it charged consumers." Id. ¶¶ 17–18. Over the next two years, uBiome developed and released SmartGut and SmartJane, both of which the company described as covered by health insurance. Id. ¶ 19.

### A. The Alleged Insurance Fraud

The thrust of the complaint is that Richman and Apte implemented and oversaw certain improper practices to create the false appearance that SmartGut and SmartJane qualified for insurance reimbursement and that, as a result, uBiome had strong prospects for growth. The allegedly improper practices generally fall into two categories: (1) issues related to uBiome's doctor network and (2) misrepresentations to insurers. The complaint alleges that Defendants knew or were reckless in not knowing that once these practices came to light, insurers would "reject reimbursement claims for uBiome's clinical tests," delivering a body blow to the company's business model. Id. ¶ 21.

#### 1. Doctor Network

The first set of allegedly improper practices centers around uBiome's doctor network. Id. ¶ 23. To qualify for reimbursement, insurers generally require that a diagnostic test be ordered by a doctor. Id. ¶ 22. To meet this requirement, uBiome created

---

[1] Richman and Apte were also members of the company's Board of Directors. Compl. ¶ 16.

2

an online portal through which patients could connect with doctors to determine the appropriateness of uBiome's tests.  Id.

The doctor network allegedly fell short of insurer standards in two ways.  First, the "default" set up was for doctors in the network to prescribe uBiome's tests "based solely on online questionnaire responses" without any live consultation.  Id. ¶ 23.  Prescribing tests based solely on online questionnaires raised concerns about whether doctors were prescribing tests without first establishing the requisite doctor-patient relationship.  Id.

Shortly after the doctor network went live in July 2017, uBiome employees raised this concern with Defendants.  Id. ¶ 21.  In summer of 2017, for example, the company's general counsel emailed defendants that "any tests prescribed based solely on consumers' questionnaires, versus a live consultation between consumer and doctor, would be a reimbursement risk."  Id. ¶ 23.  Not only did Defendants continue to use the doctor network despite these concerns, they also allegedly "concealed" the network's continued use "from the general counsel and the uBiome board."  Id.

The second issue with the doctor network concerned tests of "dubious clinical utility."  Id. ¶ 24.  The tests of "dubious" utility involved re-testing of old samples that consumers previously submitted.  Id.  Defendants allegedly orchestrated a scheme whereby consumers were "broadly" advertised the option of retesting their samples.  Id.  When consumers elected to retest an old sample, the consumer's request was made to "appear to be requests for tests on new samples" to network doctors.  Id.  As a result, "at Defendants' direction, uBiome resubmitted consumers' originally reported symptoms to the doctors reviewing retest requests as if they were newly reported symptoms."  Id.

The practice of presenting retests as requests for new tests also raised concerns among employees.  Id. ¶ 24.  In 2017, for example, uBiome's former lab director warned that the "retests lacked 'current clinical relevance' and could be fraudulent."  Id.  Again, Defendants allegedly disregarded the concerns and continued the practice of retesting old samples "from at least late 2017 through 2018."  Id.

### 2.     Misrepresentations to Insurers

The second set of alleged improper practices involved misrepresentations to insurers. The complaint includes specific and general examples of these alleged misrepresentations. Specifically, Defendants learned in May 2018 that certain insurers were requesting medical records "reflecting that doctors had contemporaneously consulted with patients for the billed tests." Id. ¶ 25. uBiome did not have such records, so Defendants "directed company employees to create and backdate records to make it seem as though doctor-patient consultations had occurred, and then to submit those fake records to insurance companies." Id.

More generally, the complaint alleges that Defendants engaged in various forms of deceptive practices to obtain reimbursement from insurers. Id. ¶¶ 25–26. These practices included billing for tests that had not been performed and "might never be performed because the version of the test to be used had not been proved to work." Id. ¶ 26. In addition, Defendants oversaw the manipulation of billing codes, including directing employees "to use incorrect insurance billing codes and/or vary the codes when billing for the same type of test to avoid claims rejection, even though there was no legitimate basis for doing so." Id.

As with the doctor network and the practice of retesting old samples, employees expressed worries about the legitimacy of the company's practices with insurers, but Defendants did not address the issues. Id. The concerns eventually began to extend beyond employees, as multiple insurers began to challenge uBiome's practices, including one that alleged that the company was engaging in "fraud and abuse." Id. ¶ 44.

### B.     The Series C Funding Round

The various forms of alleged insurance fraud were all underway when the company began its Series C funding round in May 2018. Id. ¶ 34. And the complaint alleges that Defendants' false and misleading statements to investors during the Series C funding round enabled the company to raise, and Defendants to make, millions of dollars.

Defendants' alleged Series C misrepresentations generally fall into two buckets.

First, Defendants told investors that insurance-covered tests were driving the company's revenue growth.  Id. ¶ 27.  For example, Richman provided the lead Series C investor with information showing that "uBiome generated nearly 91% of its revenue from health insurance reimbursements by the first quarter of 2018" and that it "projected billing for its clinical tests to increase to approximately 97 percent of its total revenue by 2020."  Id.; see also id. ¶ 39 (Richman told Series C investors that uBiome would generate more than "$100 million total revenue for 2018").  Highlighting current and projected revenue growth helped assure investors that the company had a strong business model and the ability to generate and grow revenue through insurer reimbursements.  Id. ¶ 33.

In addition to highlighting the company's strong growth prospects, Defendants allegedly misled investors about the company's ability to obtain insurance reimbursement for its tests.  Id. ¶¶ 38–41.  Throughout May and September 2018, Defendants prepared and provided pitch decks and "other promotional materials" to investors that repeatedly emphasized that uBiome's clinical tests were "ordered by doctors, reimbursed by insurance."  Id. ¶ 33.  The purpose of these alleged misrepresentation was to reassure investors that uBiome's business model rested on a solid foundation that would enable continued growth.  See id. ¶ 42.

The Series C funding round ultimately closed in September 2018, with uBiome successfully raising $59M from a group of twenty-seven investors.[2]  Id. ¶¶ 28–30.  As part of the Series C offering, both Richman and Apte sold $5 million worth of shares in the company, taking home $5 million apiece.  Id.

**C.     uBiome's Bankruptcy**

uBiome's fortunes took a sharp turn south following the Series C funding round.  By April 2019, "at least 18" insurers had challenged the legitimacy of uBiome's business and billing practices.  Id. ¶ 44.  Several insurers sought to clawback their reimbursement payments from the company.  Id.  That same month, the FBI executed a search warrant of

---

[2] Six investors also purchased convertible promissory notes for more than $2 million.  Compl. ¶ 28.  The notes could be converted into uBiome stock.  Id.

5

uBiome's San Francisco headquarters. Id. ¶ 45. Both Richman and Apte were fired approximately two months later. Id.

In September 2019, in the wake of the FBI raid and termination of the company's two co-founders, uBiome suspended its operations and filed for bankruptcy protection. Id. ¶ 46. Currently, the company is "undergoing Chapter 7 bankruptcy liquidation." Id.

### D. Procedural History

The SEC filed a complaint against Defendants on March 18, 2021. See generally Compl. The complaint alleges two causes of action against Defendants: (1) violations of Section 17(a) of the 1933 Securities Act and (2) violations of Section 10(b) of the 1934 Exchange Act and Rule 10b–5 promulgated thereunder. Id. ¶¶ 47–52. Defendants have filed a joint motion to dismiss the complaint. See generally MTD. The SEC opposes the motion. Opp. to MTD ("Opp.") (dkt. 47).

## II. LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim that is facially plausible. Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft, 556 U.S. at 678. The court "must take all of the factual allegations in the complaint as true," but it is "not bound to accept as true a legal conclusion couched as a factual allegation." Id. The plausibility standard does not impose a "probability requirement, but it asks for more than a sheer possibility that a defendant acted unlawfully." Id. (citation omitted).

A complaint alleging fraud must also "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009). In particular, Rule 9(b) requires a plaintiff to set forth the "who, what, when, where, and how" of the alleged fraud. Vess v. Ciba Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003). The purpose of Rule 9(b)'s heightened pleading requirement is to provide notice to defendants of the specific fraudulent conduct against which they

must defend. Bly-Magee v. California, 236 F.3d 1014, 1018 (9th Cir. 2001); Semegen v. Weidner, 780 F.2d 727, 732 (9th Cir. 1895) (the complaint "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute fraud").

### III. DISCUSSION

The SEC alleges that Defendants violated Section 17(a) and Section 10(b) and Rule 10(b)-5 thereunder. Claims for violation of Section 17(a) and Section 10(b) "require that the SEC plead much of the same elements." S.E.C. v. Trabulse, 526 F. Supp. 2d 1001, 1004 (N.D. Cal. 2007). For both claims, the SEC must plead facts showing: "(1) a material misstatement or omission (2) in connection with the offer or sale of a security (3) by means of interstate commerce." S.E.C. v. Phan, 500 F.3d 895, 907–08 (9th Cir. 2007). Claims based on a violation of Section 17(a)(1) and Section 10(b) also require sufficient allegations to show scienter while claims for violation of Section 17(a)(2) and (3) require a showing of negligence. Id.

The through line of Defendants' motion to dismiss is that the complaint "lacks the required particularity to adequately allege any actionable securities fraud." MTD at 5. Defendants make a series of arguments along this line, none of which are persuasive. Contrary to Defendants' claims, the complaint sets forth a clear theory of fraud with the required particularity. Try as they might, Defendants cannot win dismissal by burying their heads in the sand and feigning ignorance of the claims against them.

#### A. Rule 9(b) Pleading Requirements

Defendants make several arguments about why the complaint falls short of Rule 9(b) pleading requirements. See MTD at 5–6 (the complaint constitutes impermissible shotgun pleading); id. at 8 (the complaint fails to identify specific statements); id. at 10 (the complaint "consistently fails to distinguish" between defendants). None of these arguments are persuasive.

Rule 9(b) does impose a heightened pleading standard for fraud claims, but it does not require the granular details that Defendants appear to call for. Instead, Rule 9(b) "only requires the identification of the circumstances constituting fraud so that the defendant can

7

prepare an adequate answer from the allegations." Walling v. Beverly Enterprises, 476 F.2d 393, 397 (9th Cir. 1973). It "does not require nor make legitimate the pleading of detailed evidentiary matter." Id.; S.E.C v. Levin, 232 F.R.D. 619, 624 (C.D. Cal. 2005).

Applying this standard, Defendants' arguments fail. Defendants claim that the complaint constitutes improper "shotgun" pleading because each count "incorporates all allegations" of the complaint. MTD at 6. But the SEC's decision to "set out all of their fact allegations and then follow such allegations with their legal claims" provides no basis for dismissal here because the complaint sets forth a clear theory of fraud enabling Defendants to understand how the alleged facts relate to the claims against them. See . S.E.C. v. Daifotis, No. C 11-00137 WHA, 2011 WL 2183314, at *3 (N.D. Cal. June 6, 2011). Given the detailed nature of the allegations, Defendants' claim that the complaint "makes it impossible for Dr. Richman and Dr. Apte to respond to the claims brought against them" is simply incredible. MTD at 6.

Defendants also contend that the complaint should be dismissed because it fails to identify all of the alleged misrepresentations. MTD at 8. But "the SEC is not required to plead detailed evidence concerning each and every fraudulent act alleged." Levin, 232 F.R.D. 619, 624 (C.D. Cal. 2005). The complaint includes both specific examples and general categories of allegedly false and misleading statements that Defendants allegedly made during a specific time period (the Series C funding round) to a particular persons (the Series C investors). See also SEC v. Med. Cap. Holdings, Inc., 2010 WL 809406, at *3 (C.D. Cal. Feb. 24, 2010) ("the SEC is not required under Rule 9(b) to plead which particular investors were injured by their reliance on the false statements"). As discussed more in the next section, the complaint provides sufficient notice of the nature of the alleged misrepresentations so that Defendants can prepare a defense against them.

Defendants' claim that the complaint "consistently" fails to distinguish between Defendants similarly fails. MTD at 10. Contrary to this claim, the complaint in fact does consistently distinguish between Defendants. See Opp. at 9–10 (providing multiple examples of how the complaint distinguishes between actions that Defendants performed

8

jointly and individually). Moreover, it alleges sufficient facts to put Defendants on notice of the conduct that forms the basis of the SEC's claims. As with the others, this argument also provides no grounds for dismissal.

### B. Sufficient Particularity

Defendants primarily argue that the complaint fails to plead its claims with the required particularity. See MTD 7–20. They make two main arguments in this regard, namely that the complaint fails to adequately allege the misrepresentations (id. at 8–10) and that the complaint fails to plead falsity and materiality (id. at 10–19).

Both of Defendants' arguments fail for the same reason—the bar for pleading Section 17 and Section 10(b) fraud claims is not nearly as high as Defendants would like it to be. While Defendants repeatedly fault the SEC for failing to include certain details, their attacks do not change the fact that the complaint presents a clear and cohesive theory of fraud supported by the required specifics.

#### 1. Misrepresentations

Defendants' first main argument is that the complaint fails to allege the "who, what, when, where, and how" of the alleged fraud. MTD at 8. Rulings in analogous cases make clear why this argument fails.

A complaint sufficiently alleges fraud when it contains "sufficient detail to put defendant on notice of the claims against him." SEC v. Tabulse, 526 F. Supp. 2d 1001, 1005 (N.D. Cal. 2007). In Trabulse, the defendant managed a hedge fund for several years and allegedly lied to investors about the fund's performance by overstating its profits and understating its losses. Id. 1002–03. As with the Defendants here, the defendant in Tabulse moved to dismiss the SEC's complaint against him, arguing that "the SEC failed to state with particularity each of the statements that it believed to be materially misleading." Id. at 1004. The court rejected this argument because "the examples provided by the SEC do provide times, dates, places, benefits received, and other details of the alleged fraud." Id. The examples included "account statements" and "newsletters" sent to investors during specific time periods that allegedly misrepresented the fund's

9

performance. Id. at 1002–03. Based on these examples, the court found that the complaint sufficiently set forth "the circumstances of the alleged fraud—the period in which it occurred, who Trabulse communicated to, how he communicated to them, the content of the communications, and the benefits reaped from his actions." Id. at 1005.

In addition, a complaint adequately alleges that a defendant may be liable for a misstatement where it shows that the defendant was "substantially" or "intricately" involved with the preparation of the alleged misrepresentations. Daifotis, 2011 WL 2183314, at *4. In Daifotis, the defendants allegedly made false and misleading statements about the risks and performance of a bond fund they managed. Id. at 1–2. Defendants moved to dismiss, arguing that the SEC's complaint failed to show "substantial participation in the preparation of the allegedly false statements." Id. at 3. The statements at issue were made in "press releases," a "website," "sales materials," and "filings," and the defendants argued the statements were "not directly attributable" to them. Id. The court rejected the argument, finding that a defendant may be liable for a statement if they "substantially participated" or were "intricately involved" in its preparation. Id. at 4 (quoting Howard v. Everex Sys., Inc., 228 F.3d 1057, 1061 n. 5 (9th Cir. 2000)) (cleaned up). Given that the complaint adequately alleged substantial involvement, defendants' motion to dismiss on this ground was denied. Id. at 7.

The complaint here adequately alleges the "circumstances of the alleged fraud." Tabulse, 526 F. Supp. 2d at 1005. Specifically, the complaint alleges that Defendants made specific misrepresentations (i.e. statements about sustainable revenue growth and insurer-covered tests) to a specific audience (i.e. Series C investors) during a particular time period (i.e. the Series C funding round from May 2018 to September 2018). The complaint includes both specific and general examples of how these misrepresentations were made. It refers to specific emails that Richman sent to investors (e.g. Compl. ¶¶ 38–39) and general pitch decks that both Richman and Apte authored and presented (e.g. id. ¶¶ 32, 34, 41). The complaint further adequately alleges that Richman and Apte—who co-founded the company, managed it closely, and interacted directly with investors—made

10

1  and substantially participated in the making of the allegedly misleading statements.
2  Daifotis, 2011 WL 2183314, at *4.  And it adequately alleges that Richman and Apte knew
3  or should have known that the statements made to investors about the company's revenue
4  growth and eligibility for insurance reimbursement were false and misleading because they
5  omitted serious concerns that had been raised about the company's business practices.
6  Compl. ¶¶ 22–26.  The complaint also includes sufficient allegations regarding Richman
7  and Apte's motives for the alleged fraud, namely both sought to raise and make millions of
8  dollars from investors.  Id. ¶¶ 28–30.  Thus, the complaint contains sufficient detail to put
9  Defendants on notice of the claims against them.  Tabulse, 526 F. Supp. 2d at 1005.  No
10 more particularity is required.

11     Defendants' reliance on Francisco is not persuasive.  MTD at 8 (citing SEC v
12 Francisco, 262 F. Supp. 3d 985, 987–88 (C.D. Cal. 2017).  In Francisco, the defendant
13 raised millions of dollars from foreign investors over a three-and-a-half year period across
14 multiple fund-raising rounds.  Francisco, 262 F. Supp. 3d 985, 987–88 (C.D. Cal. 2017).
15 The purpose of the money was to fund EB-5 investments that would enable the foreign
16 investors to qualify for EB-5 visas.  Id.  The SEC's complaint alleged that the defendant
17 embezzled millions of dollars from the funds and deceived investors by making
18 misrepresentations during the funding rounds.  Id.  The court dismissed the complaint
19 because it failed to specify the nature of the misrepresentations that were made during any
20 of the particular funding rounds, instead alleging in blanket fashion that certain unspecified
21 fraud occurred across all of the funding rounds.  Id. at 989–90 (the complaint did not
22 "clearly present" defendant's role in the fraud and did "not delineate the nature of the fraud
23 in each particular offering").

24     In contrast to Francisco, there was only one funding round at issue here—the Series
25 C funding round that took place from May 2018 through September 2018.  And unlike
26 Francisco, the nature of the alleged fraud that took place during that funding round is clear:
27 Defendants touted the strength and promise of their business to investors while failing to
28 disclose facts suggesting that their business was in serious jeopardy.  The allegations in

United States District Court
Northern District of California

11

Francisco were overly vague, while those here are sufficiently specific.

### 2. Falsity and Materiality

Defendants next argue that the complaint fails to adequately allege that any of the statements made to investors were materially false or misleading. MTD at 10–19. In particular, Defendants contend that the complaint fails to allege sufficient facts to show that the statements that uBiome's tests were "ordered by doctors" (see MTD at 11–13) and were "reimbursed by insurance" (see MTD at 13–19) were materially false and misleading.

Rule 10b-5 prohibits "misleading and untrue statements," but it does not prohibit statements that are "incomplete." Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1006 (9th Cir. 2002). For a statement to be misleading, it must "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." Id. A misrepresentation "is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 946 (9th Cir. 2005).

Case law again makes clear why the complaint here adequately alleges materially false and misleading statements. In American West, the Ninth Circuit found that "optimistic statements regarding [defendant's] financial condition" were materially misleading because the defendant failed to disclose various operational challenges that were negatively affecting the company. No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp., 320 F.3d 920, 935 (9th Cir. 2003). In Warshaw, the Ninth Circuit found that the defendant's statements touting a drug's likelihood of FDA approval were materially misleading because defendant failed to disclose that "serious doubts" had been raised about the drug's "effectiveness and the chances for prompt FDA approval." Warshaw v. Xoma Corp., 74 F.3d 955, 957–60 (9th Cir. 1996).

As in American West and Warshaw, Defendants allegedly deceived investors by making optimistic statements about their company without disclosing the significant risks to the very viability of the business. During the Series C funding round, Defendants touted

12

their business to investors, pointing to optimistic revenue forecasts and reassuring investors that their business model was fundamentally sound. Compl. ¶¶ 33–34, 38–41. These misrepresentations were misleading because Defendants failed to disclose the serious concerns that had been raised about the viability of uBiome's business model. See Warshaw, 74 F.3d at 960 (defendants made "optimistic statements" without disclosing the "unflattering facts"). Defendants represented that their tests were "ordered by doctors" despite allegedly knowing (1) that tests ordered through the doctor network were at risk of reimbursement denial because the doctors lacked the required doctor-patient relationship (Compl. ¶ 23) and (2) that retests were potentially subject to insurer denial because key information was omitted from doctors ordering the tests (id. ¶ 24). Similarly, Defendants claimed that their tests were reimbursed by insurers despite knowing that (1) in May 2018, at the start of the Series C funding rounding, the company had to falsify documentation in response to insurer inquiries (id. ¶ 25) and (2) during the Series C funding round, insurers challenged the company's practices, including allegations of "fraud and abuse" (id. ¶ 37).

In sum, Defendants boasted about their revenue growth but failed to disclose that serious questions had been raised by employees and insurers about the legitimacy of the practices that fueled that growth (see id. ¶ 27). Thus, it is fair to conclude at the pleading stage that a "reasonable investor would have acted differently" if they had known about the various undisclosed risks to uBiome's business model. Livid Holdings, 416 F.3d at 946.

### C. Scheme Liability

Defendants also move to dismiss the complaint on the ground that it fails to plead scheme liability. MTD at 21–22.

To state a claim for scheme liability under Section 17(a)(1) or (a)(3) or Rule 10b–5(a) or (c), "the SEC must allege that the defendant 'engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme' in the offer or sale (for Section 17(a)) or in connection with the purchase or sale (for Section 10(b)) of a security." Sec. & Exch. Comm'n v. Sidoti, 2021 WL 1593253, at *9 (C.D. Cal. Mar. 19, 2021) (citing 15 U.S.C. § 77q(a); 17 C.F.R. § 240.10b–5). These

provisions "capture a wide range of conduct." Lorenzo v. SEC, 139 S. Ct. 1094, 1101 (2019).

Defendants argue that "[f]or the same reasons that the Complaint fails to detail the falsity of the alleged misrepresentations, the Complaint fails to allege a scheme with particularity." MTD at 21. The opposite is true. As discussed above, the complaint adequately alleges that Defendants made actionable misrepresentations to investors during the Series C funding round. For the same reasons, the complaint adequately alleges scheme liability—specifically, Defendants allegedly created false appearances of fact by misleading Series C investors about the strength and sustainability of the company's business model when they allegedly knew that the walls were closing in around them.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is denied.

**IT IS SO ORDERED.**

Dated: November 3, 2021

CHARLES R. BREYER
United States District Judge